680 A.2d 884

COMMONWEALTH of Pennsylvania

v.

Julian Thomas BROWN a/k/a Thomas J. Brown, Appellant.

Superior Court of Pennsylvania.

Submitted May 2, 1996.

Filed July 15, 1996.

Sanford A. Middleman, Pittsburgh, for appellant.

Claire C. Capristo, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before POPOVICH, EAKIN and HESTER, JJ.

HESTER, Judge.

Julian Thomas Brown a/k/a Thomas J. Brown appeals the May 4, 1995 order denying him the right to withdraw his guilty plea. We affirm.

The record indicates the following. On September 20, 1991, appellant pled guilty in connection with two criminal actions. At criminal action number 9006354, appellant pled guilty to aggravated assault, and in exchange, the Commonwealth dismissed charges of receiving stolen property and two counts of violations of the Uniform Firearms Act. The firearms violations stem from the fact that appellant, a former convict, was carrying an unlicensed firearm. At criminal action number 9005616, appellant pled guilty to a violation of the same act, and the Commonwealth agreed to dismiss a charge of altering, forging, or counterfeiting documents or plates under the Motor Vehicle Code. The sentence to be imposed in both actions was to be five to ten years imprisonment because one of the charges to which appellant pled guilty carried that mandatory minimum.

The evidence which would have been presented against appellant was summarized by the district attorney as follows:

Had we proceeded to trial in this matter, we would show through the testimony of Pittsburgh Police Officers Nagy, Wade, Cust, Connelly, Conway, Fitzgerald, Lenny, also Dr. Robert Levine of the Allegheny County Crime Lab and Mr.

Melvin Akers that on January 22, 1990, Mr. Akers was residing at 5514 Black Street. He opened the door in the early morning hours and found Mr. Brown at his door. Mr. Brown was asking to use the telephone.

Mr. Akers allowed Mr. Brown into his home for that purpose. And after using the phone, Mr. Brown then shot Mr. Akers in the stomach area.

Mr. Brown then fled the home. The victim was able to call the police.

When the police arrived, he opened the door and showed the officers where he was shot.

The spent casing was recovered from the kitchen floor, and eventually the bullet was removed from Mr. Akers' stomach area and sent—the casing and the bullet were sent to the Allegheny County Crime Lab.

Approximately two months later on March 23, 1990, around one o'clock in the afternoon, Officers Connelly and Fitzgerald stopped Mr. Brown on Centre Avenue near Devilliers Street and stopped him for the purpose of giving a traffic citation. They patted him down, and on his person they found a .25 caliber Raven semiautomatic pistol. That was seized from him.

He was placed under arrest. Sent to the Allegheny County Crime Lab, and at Crime Lab Number 901751, the pistol with Serial Number 135147 was test-fired, found to be in good operating condition. The bullets and cartridges were compared to bullets and cartridges in the open case file and an identification was made. The identification that was made was that the test cartridge cases fired from that bullet matched the spent cartridge case submitted to the Crime Lab on January 23, 1990, by the Pittsburgh Police on the Melvin Akers case.

The bullet that was fired also had the striations from the Melvin Akers—similar to the bullet that was fired in the Melvin Akers assault case.

The barrel length was measured to be two and three-eights of an inch. The defendant did not at that time have a license to carry that firearm.

Notes of Testimony ("N.T."), 9/20/91, at 9–11. After this summary, the district attorney and defense counsel told the court that there was a negotiated plea and that appellant knew that he was to receive two concurrent five to ten year sentences. The trial court accepted the plea agreement and sentenced appellant to an aggregate term of five to ten years in prison. *Id.* at 16.

On October 8, 1991, appellant filed a pro se motion to withdraw his guilty plea, alleging that his plea was unlawfully induced by his counsel, that the sentence was outside the guidelines, and that the sentence was improper since no presentence report had been filed. On November 8, 1991, the court conducted a hearing on the motion to withdraw the guilty plea.

The trial court reviewed the guilty plea explanation form executed by appellant. The court observed that appellant initialled his negative answer to the question of whether any threats had been made against him in connection with the plea. Similarly, appellant initialed the negative answer to the question of whether any promises had been made to induce the guilty plea other than the express plea negotiated by his counsel. Finally, appellant responded affirmatively to the question of whether he was satisfied with counsel's representation.

As to appellant's sentencing claims, the trial court made the following observations. Appellant had waived his right to a presentence report at the time the plea was entered. Furthermore, given the offense gravity score for the offenses at issue and appellant's prior record score of four, appellant's sentence for the aggravated assault conviction was in the mitigated range, and his sentence for the firearm violation was in the standard range.

Appellant then testified at the hearing. Even though the plea colloquy clearly indicates that the negotiated sentence

was five to ten years imprisonment, appellant insisted that he had been told that the maximum sentence he would receive was five years imprisonment. Thus, appellant was effectively cross-examined as follows:

Q You are telling this Court that you knew you were being sentenced to five to ten years, but you just went ahead and did it anyway?

A I thought five years was my maximum sentence, sir.

Q You heard Judge Little say it was five to ten years; didn't you? You heard that?

I mean, you were standing right here in front of this microphone when that was done; weren't you? Right here? Right here?

You heard him say that; didn't you?

A Yes, sir I heard him.

Q Okay. At that point you knew it was a five-to-ten-year sentence; didn't you? Yes or no.

A Yes.

Q But you did not say anything at that point; did you? You did not say, wait a minute, that is not my understanding of the plea agreement? You did not say anything at that point?

A No.

Q Okay. You did not say anything to Judge Little that that is not your understanding of the plea agreement?

A No.

Q You remember the Judge saying that to you; didn't he?

A Yes.

N.T., 11/8/91, at 24–15. Based on the foregoing, appellant's motion to withdraw his guilty plea was denied. Appellant, pro se, filed an appeal from that denial, which was dismissed due to technical defects.

On January 8, 1992, appellant filed a petition for relief under the PCRA. Counsel was appointed, and he filed an amended petition. Among other things, appellant requested reinstatement of his appellate rights based on the fact that he

had asked counsel to file a direct appeal. While appellant's appellate rights were reinstated nunc pro tunc, appellant was denied PCRA relief. This appeal followed.

Appellant, represented by new counsel, contends that he is entitled to withdraw his guilty plea because he was not informed of the fact that by entering the plea, the probation he was serving as to other crimes would be revoked. Appellant relies upon *Commonwealth v. Persinger*, 532 Pa. 317, 615 A.2d 1305 (1992) and *Commonwealth v. Fay*, 294 Pa.Super. 332, 439 A.2d 1227 (1982). In *Persinger*, the Supreme Court ruled that a plea was unknowingly tendered because the defendant was not informed that the sentences for the crimes to which he was pleading guilty could be imposed consecutively, and those sentences subsequently were imposed consecutively. In *Fay*, we ruled that a guilty plea was not knowingly tendered when the defendant was not informed that the sentence for the crime to which he was pleading guilty could be imposed consecutively to a sentence he then was serving on federal charges.

Herein, appellant acknowledges that he was informed that the sentences could be imposed consecutively. We add that in this case, appellant's sentences were imposed concurrently. Rather, appellant argues that a collateral consequence of entry of plea, which is that his probation on a prior conviction could have been revoked, never was explained to him and this fact alone renders his plea involuntary.

 Once a guilty plea has been entered and sentence imposed, the plea may be withdrawn only upon a showing of manifest injustice, which may be established if the plea was not voluntarily or knowingly entered. *Commonwealth v. Carter*, 540 Pa. 135, 656 A.2d 463 (1995). However, the appellate courts of the Commonwealth consistently have ruled that a defendant's lack of knowledge of *collateral* consequences to the entry of a guilty plea does not render a plea unknowing or involuntary. *Commonwealth v. Frometa*, 520 Pa. 552, 555 A.2d 92 (1989) (plea valid even though defendant not informed he would face deportation as a result of plea); *Pennsylvania*

*Department of Transportation v. Johnson,* 434 Pa.Super. 1, 641 A.2d 1170 (1994) (guilty plea to various drug charges could not be withdrawn based on fact defendant was not told that his driver's license would be suspended for ninety days due to entry of plea); *see also Commonwealth v. Duffey,* 536 Pa. 436, 639 A.2d 1174 (1994).

■ Probation revocation proceedings in an unrelated criminal action do not involve sentencing consequences of pleading guilty in the action at issue. Thus, we hold that the possibility of probation revocation is a collateral consequence to a guilty plea, and the fact that a defendant was not informed that he faces such a possibility in an unrelated criminal case does not undermine the validity of the plea. *Accord Parry v. Rosemeyer,* 64 F.3d 110 (3rd Cir.1995).

Order affirmed.